# IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT
## NO. 24-1292

| | | |
|---|---|---|
| JASON LEE, | ) | |
| | ) | Appeal from the |
| Defendant-Appellant, | ) | United States District Court |
| | ) | |
| v. | ) | Southern District of Indiana, |
| | ) | Indianapolis Division |
| WILLIAM MANERY, | ) | |
| | ) | Case No. 1:22-cv-239 SEB-MG |
| Plaintiff–Appellee. | ) | |
| | ) | The Hon. Sarah Evans Barker, Judge |

---

## BRIEF AND REQUIRED SHORT APPENDIX
## OF DEFENDANT-APPELLANT

---

Anthony W. Overholt, #16481-49
Darren A. Craig, #25534-49
Alexander P. Will, #23474-49
FROST BROWN TODD LLP
111 Monument Circle, Suite 4500
P.O. Box 44961
Indianapolis, IN 46244-0961
Telephone:   (317) 237-3800
Facsimile:   (317) 237-3900
Email:        aoverholt@fbtlaw.com
              dcraig@fbtlaw.com
              awill@fbtlaw.com

_____

Attorneys for Defendant-Appellant

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1292

Short Caption: Jason Lee, et al. v. William Manery

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jason Lee, Marion County Sheriff's Office, Consolidated City of Indianapolis and Marion County

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Frost Brown Todd LLP

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

      none

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      none

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Anthony W. Overholt     Date: February 28, 2024

Attorney's Printed Name: Anthony W. Overholt

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✓]   **No** [ ]

Address: 111 Monument Circle, Suite 4500

Indianapolis, IN 46204

Phone Number: 317-237-3800     Fax Number: 317-237-3900

E-Mail Address: aoverholt@fbtlaw.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1292

Short Caption: Jason Lee, et al. v. William Manery

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Jason Lee, Marion County Sheriff's Office, Consolidated City of Indianapolis and Marion County

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Frost Brown Todd LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and
        none

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
        none

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ Darren A. Craig    Date: February 28, 2024

Attorney's Printed Name: Darren A. Craig

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☐ No ☑

Address: 111 Monument Circle, Suite 4500

Indianapolis, IN 46204

Phone Number: 317-237-3800    Fax Number: 317-237-3900

E-Mail Address: dcraig@fbtlaw.com

rev. 12/19 AK

ii

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1292

Short Caption: Jason Lee, et al. v. William Manery

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jason Lee, Marion County Sheriff's Office, Consolidated City of Indianapolis and Marion County

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Frost Brown Todd LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    none

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    none

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Alexander P. Will    Date: February 28, 2024

Attorney's Printed Name:  Alexander P. Will

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address:  111 Monument Circle, Suite 4500

    Indianapolis, IN 46204

Phone Number: 317-237-3800    Fax Number:  317-237-3900

E-Mail Address: awill@fbtlaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

Circuit Rule 26.1 Disclosure Statement ........................................................................ i

Table of Contents ......................................................................................................... iv

Table of Authorities .................................................................................................... v

Jurisdictional Statement ............................................................................................. 1

Statement of the Issues Presented for Review ........................................................... 2

Statement of the Case ................................................................................................. 3

Summary of the Argument .......................................................................................... 12

Argument ..................................................................................................................... 12

    Lt. Lee is entitled to qualified immunity for his actions in apprehending a
dangerous suspect wanted on a felony warrant for multiple charges. ........... 12

    A.    Lt. Lee did not violate the Fourth Amendment when he fired at
Manery. ........................................................................................................ 13

        1.    General Fourth Amendment principles. ......................................... 13

        2.    Lt. Lee did not violate the Fourth Amendment by using
deadly force given Manery's actions colliding with two police
cars and driving toward Lt. Lee even though he was able to step
out of Manery's path of travel during the crucial seconds before
firing. ........................................................................................................ 15

        3.    The district court's decision improperly requires police
officers to reevaluate instantly the need to use force in
dangerous and evolving circumstances. ............................................... 16

    B.    At a minimum, Lt. Lee is entitled to qualified immunity for his
actions. ........................................................................................................ 21

Conclusion ................................................................................................................... 28

Certificate of Compliance with F.R.A.P. Rule 32(A)(7) ............................................ 29

Circuit Rule 30(d) Statement ..................................................................................... 30

Certificate of Service................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016)....................................................25

*Bland v. City of Newark*, 900 F.3d 77 (3rd Cir. 2018)...........................................26

*Brumitt v. Smith*, ___ F.4th ___, 2024 WL 2269489 (7th Cir. May 20, 2024) . passim

*Day v. Wooten,* 947 F.3d 453 (7th Cir. 2020) ........................................................23

*Dockery v. Blackburn*, 911 F.3d 458 (7th Cir. 2018) ......................................13, 14

*Donovan v. City of Milwaukee*, 17 F.3d 944 (7th Cir. 1994) ...............................24

*Est. of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993)......................................23, 26

*Est. of Starks v. Enyart*, 5, F.3d 230 (7th Cir. 1993)...............................................9

*Graham v. Connor*, 490 U.S. 386 (1989)...............................................................13

*Greenberg v. Kmetko,* 922 F.2d 382 (7th Cir. 1991) ............................................27

*Gregorich v. Lund*, 54 F.3d 410 (7th Cir. 1995) ...................................................22

*Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009) ....................................................25

*Lovett v. Herbert*, 907 F.3d 986 (7th Cir. 2018) ...................................................13

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ...............................................................1

*Mullins v. Cyranek,* 805 F.3dd 760 (6th Cir. 2015)..............................................26

*Pearson v. Callahan*, 555 U.S. 223 (2009) ...........................................................13

*Rincon v. United States,* 2012 WL 1981725 (N.D. Ind. June 1, 2012)..................23

*Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021) ..................................................14

*Sanzone v. Gray*, 884 F.3d 736 (7th Cir. 2018)...............................................13, 14

*Saucier v. Katz*, 533 U.S. 194 (2001) ....................................................................22

*Scott v. Edinburg,* 346 F.3d 752 (7th Cir. 2003) ...........................................14, 23

*Smith v. Finkley*, 10 F.4th 725 (7th Cir. 2021)........................................................9

*Sparks v. Stutler*, 71 F.3d 259 (7th Cir. 1995) .....................................................27

*Strand v. Minchuk*, 910 F.3d 909 (7th Cir. 2018) .................................................25

*Thomas v. Moody*, 653 Fed. Appx. 667 (11th Cir. 2016) ......................................26

*Weinmann v. McClone*, 787 F.3d 444 (7th Cir. 2015) ...........................................14

*White v. Pauly*, 580 U.S. 73 (2017)........................................................................22

## JURISDICTIONAL STATEMENT

On January 17, 2022, William Manery filed in state court a complaint against Defendants Jason Lee, the Marion County Sheriff's Office ("MCSO"), the Consolidated City of Indianapolis, and Marion County alleging an unconstitutional use of force by Defendant Lee under 42 U.S.C. § 1983. Dkt. 1. Defendants timely removed the action to the district court on February 1, 2022. The district court had subject-matter jurisdiction over the cause of action pursuant to 28 U.S.C. § 1331.

On February 9, 2024, the district court granted in part and denied in part a motion for summary judgment jointly filed by all Defendants. Dkt. 76. All claims were dismissed as to the City of Indianapolis and Marion County. As to the MCSO, the federal claims were dismissed. No final judgment was entered as to those parties. *Id.* State claims remain pending against the MCSO. *Id.* The district court denied summary judgment on the grounds of qualified immunity as to the federal claim asserted against Defendant Lee. *Id.*

Pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A), Defendant Lee timely filed a Notice of Appeal on February 23, 2024. Dkt. 81. This Court has jurisdiction over this appeal, even though the district court has not entered final judgment, because a denial of a claim of qualified immunity "is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) . This is so even though there are unresolved factual questions presented by the district court's order denying summary judgment because "construing all the facts in [Plaintiff's] favor, we can decide whether it is clearly established under the

Fourth Amendment that [Plaintiff] had a right to be free from [Defendant's] use of force under the circumstances —a pure question of law." *Brumitt v. Smith*, ___ F.4th ___, 2024 WL 2269489, *4 (7th Cir. May 20, 2024).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. William Manery was wanted on a felony warrant and previously threated "suicide by cop." The deputies were also told Manery was armed. When approached by Lt. Lee and his warrant team, Manery threw his Jeep into reverse, rammed a police car, struck a curb, and then drove towards Lt. Lee, hitting a second police car and stopping. Within three seconds of Manery starting to drive forward after hitting the curb, Lt. Lee fired. Was Lt. Lee's use of force reasonable under the Fourth Amendment in this dangerous and quickly evolving situation?

2. The district court found that there was a question of fact for trial as to Lt. Lee's use of force because he did not immediately reassess the situation when Manery stopped his forward movement after striking the second police car. However, decisions from this Court—including a published decision earlier this month—say that officers in this sort of dangerous encounter cannot instantaneously process these sorts of changes occurring in just seconds, thus entitling officers to immunity. Does this intra-circuit conflict in how the Fourth Amendment is analyzed entitle Lt. Lee to qualified immunity?

## STATEMENT OF THE CASE

A. *Facts known to Deputy Lee before arresting Manery.*

On April 10, 2021, the Rutherford County Sheriff's Office in Tennessee requested assistance with executing an arrest warrant naming Plaintiff William Manery. He was wanted for multiple felonies including vehicular aggravated assault, violation of probation, and evasion to avoid arrest. In notes sent to the MCSO when it requested assistance in Manery's apprehension, the Rutherford County Sheriff's Department stated that Manery was armed, had made threats of "suicide by cop," and may attempt to flee.[1] When requesting assistance in apprehending Manery, Rutherford County informed the MCSO that Manery was located at 6311 E. Westfield Blvd. in Broad Ripple, a residential and commercial area north of downtown Indianapolis where Manery was later apprehended.

Lt. Lee also knew that besides Manery's being wanted on felony warrants, Manery had stated "he will commit suicide by cop," which Lt. Lee understood to mean Manery said he would knowingly place himself in a dangerous confrontation with law enforcement officers to cause those officers to use deadly force against him. Dkt. 76 at 14; Jason Lee Decl., Dkt. 48-4 at ¶ 10. These facts as established in the district court were based in part on the message provided to Lt. Lee by Rutherford County:

---

[1] It was later determined that Manery was not armed. However, the district court correctly concluded that for purposes of Manery's Fourth Amendment claim, Lt. Lee reasonably relied on this information provided by Rutherford County. Dkt. 76, n.5.

```
15:36:18 04/10/2021    CMNTS                                    IM26

Comments
  W/M WILLIAM MANERY DOB█████████...WARRANTS FOR ASSAULT, EVADING ARREST....OUT OF
RUTHERFORD TENNESSEE....SAID HE WILL COMMIT SUICIDE BY COP AND IS ARMED WITH A
HANDGUN....DRIVING A WHITE JEEP GRAND CHEROKI WITH FRONT END DAMAGE LIC/7X73H4
TENNESSEE PLATE....DRIVER'S LIC # 1099█████...MIGHT RUN...POSS WITH A UNK/M DAREN
HICKMAN....NCIC/W013304978....GOT CALL FROM SOMEONE WHO KNOWS HIM AND HE SHOULD BE AT
THIS ADDRESS...INFO RECIEVED 15 MININUTES AGO


Comments
  MKE/WANTED PERSON
ADO/Y - THIS SUBJECT HAS MULTIPLE WARRANTS FROM THIS AGENCY
EXL/4 - NO EXTRADITION - INSTATE PICK-UP ONLY. SEE MIS FIELD FOR LIMITS
ORI/TN0020000 NAM/MANERY,WILLIAM L SEX/M RAC/W ETN/N POB/TN
DOB/██████3 HGT/601 WGT/175 EYE/BLU HAI/BRO FBI/333370KD7 CTZ/US
SKN/LGT SMT/GLASSES
████████2
███████9 OLS/TN OLY/2027
OFF/AGGRAV ASSLT - WEAPON
```

Dkt. 48-3 at 2-3.

When deputies found Manery at the location identified by Rutherford County, he was asleep in the driver's seat of a white Jeep Cherokee parked in front of an apartment building:

> Deputy White exited his vehicle and approached the driver's side of the Jeep where he discovered that the Jeep was occupied by man asleep in the driver's seat. Lt. Lee simultaneously approached the Jeep along the passenger side and identified the "disheveled" occupant as Mr. Manery. *See* Lee Dep. 49:3–4, dkt. 48-2.



00:24          00:58

Lambert Aff. ¶ 4, dkt. 48-5 (authenticating video evidence); *id*. Ex. 1 (video collected

by Darren Hickman)(hereinafter "Hickman Video"); Dkt. 76 at 4-5.

B. *Refusing deputy commands to surrender, Manery flees in his vehicle and rams a police car.*

What happened next took less than one minute and is the crux of this

litigation. Dkt. 76 at 7.

As shown in still shots captured from the video footage, Deputy White stood at the driver's side window and pointed his firearm and flashlight inside, awakening Mr. Manery with repeated commands: "Show me your hands!" and "Do not move!" Lee Dep. 35:19–21, dkt. 48-2; Manery Dep. 33:1–2, dkt. 48-1.3 Lt. Lee stood outside the passenger side window, twice striking the window with the nose of his pistol to break the glass and deploy his taser. Meanwhile, Mr. Manery proceeded to shift his hands in and out of his pockets and eventually started the ignition, despite Deputy White's commands, "Don't do that! Do not start this car!" Internal Affs. Rep. 5, dkt. 57-8. This interaction continued for approximately twenty seconds, during which time three more uniformed officers from the warrant team gathered around the Jeep.

Mr. Manery put the Jeep in reverse, striking Deputy White's parked vehicle as he arced westward toward Westfield Boulevard, where at least two vehicles were idling their engines at a four-way stop sign."



Hickman Video, dkt. 48-5.

The district court explained what happened next:

Four deputies rushed to their vehicles in anticipation of a possible vehicle chase, while Lt. Lee pursued the Jeep on foot. The

Jeep struck a curb at the edge of the parking lot, which halted the Jeep's movement. As Lt. Lee pursued the Jeep on foot, he recalled that Mr. Manery had "revved his motor to the loudest fucking engine noise [he had] ever heard in [his] life." Lee Dep. 39:3–4, dkt. 48-2.

Still attempting to escape, Mr. Manery turned the Jeep's front wheels to the left and accelerated forward, promptly colliding into Deputy Wilcox's un-marked vehicle at a perpendicular angle.



*Id.* After Mr. Manery's car struck Deputy Wilcox's car, Lt. Lee opened fire. As depicted above, Lt. Lee is no longer visible in the video frame at the time he shoots his firearm at Mr. Manery. Though initially thinking he had only fired twice, it was determined that Lt. Lee discharged a total of nine bullets, all of which entered the Jeep through the driver's side door. Lee Dep. 43:21–25, dkt. 48-2. The first four to five shots were fired in quick succession, followed by a brief pause and then a volley of the remaining bullets. Four of these bullets struck Mr. Manery.

Dkt. 76 at 7.

While the video does not show Lt. Lee's exact position when he fired, it does reveal that Lt. Lee was on the driver's side of the Jeep when he did so and that those shots were fired within a second or two of Manery driving into Deputy Wilcox's car—his second deliberate crash into a police car to escape. The driver's side of the Jeep was the direction Manery turned the Jeep's wheels. When he fired, Lt. Lee still believed Manery to be armed, and he was still aware of Rutherford County's admonition that Manery had threatened to place himself and officers in a situation where they would need to use deadly force. In describing the situation Lt. Lee faced, the district court correctly recognized:

> [T]he actual encounter with Mr. Manery occurred in less than a minute. During that brief span of time, the scene evolved into an unpredictable, highly stressful situation, requiring Lt. Lee to make split-second judgments.

Dkt. 76 at 14.

C. *Manery pleads guilty to resisting arrest as a felony*.

Manery entered a guilty plea to one count of resisting law enforcement as a Level 6 felony. Under Indiana law, his plea agreement "constitutes an admission of the truth of all the facts alleged in the charge or counts" to which he pleaded guilty. Dkt. 76 at 29. During his deposition, Manery admitted that he pleaded guilty because "[s]upposedly I hit two cop cars and tried to run from them." *Id.*, citing Dkt. 48-1, Manery Dep., 35:23-24.

D.   *The district court denies qualified immunity.*

When framing the issue as to whether the Fourth Amendment seizure was reasonable, the district court described the totality of the circumstances as "the period just before and during the shooting." *Id.* at 4 citing *Smith v. Finkley*, 10 F.4th 725, 739 (7th Cir. 2021). The district court also accepted that as a matter of Fourth Amendment law, "an officer may use deadly force when a fleeing felon drives at him with a vehicle." Dkt. 76 at 14 citing *Est. of Starks v. Enyart*, 5, F.3d 230, 233-24 (7th Cir. 1993).

The district court identified two factual disputes which it said precluded summary judgment on immunity. First, the court found there was a question of fact whether Manery was driving straight toward Lt. Lee when he fired. Specifically, the court determined that there was a dispute about whether Manery's Jeep was still headed straight for Lt. Lee *at the precise moment Lt. Lee fired his weapon* because Manery struck one of the police cars and was no longer moving forward in the approximately three seconds just before Lt. Lee got off his first shot. Dkt. 76 at 15-16. The district court reached that conclusion even though the video showed that Manery had turned his wheels to the left toward Lt. Lee just before Lt. Lee fired. Dkt. 76 at 17.

Second, the district court found there was a disputed issue of fact because Lt. Lee said he had decided to fire when in front of the Jeep but had moved 45 degrees to the side when he fired. The district court believed those actions left

unanswered "the issue of his proximity to the Jeep at the moment he fired." *Id.* at 16.

These findings reveal that the district court established the following sequence of events for purposes of summary judgment: (1) deputies went to the scene to serve a felony warrant for, among other charges, aggravated vehicular assault (Dkt. 76 at 2); (2) deputies located Manery sitting in a Jeep at the location Rutherford County said Manery could be found, a fact that supported the reliability of Rutherford County's information (Dkt. 76 at 3-4); (3) Manery refused deputy commands to surrender, fidgeted in his pockets, started the Jeep and tried to escape while deputies were standing next to that vehicle (*Id.* at 5); (4) Manery put the Jeep into reverse, struck a police car shoving it out of the way, and then hit a curb (*Id.* at 6); (5) Manery then put the Jeep into drive and drove forward toward Lt. Lee (*Id.* at 7); (5) Lt. Lee got out of the path by moving 45 degrees to the side of the Jeep as Manery drove toward him (*Id.* at 16); (6) Manery turned the Jeep's wheels toward Lt. Lee (*Id.* at 6); (7) Manery struck another police car as he drove forward and then came to a stop (Dkt. 76 at 6); and (8) Lt. Lee fired at Manery. (*Id.* at 6.)

*Again, as revealed by the video evidence, the time between Manery starting to drive forward toward Lt. Lee after hitting the curb and the time Lt. Lee fired was approximately three seconds.* (Hickman Video at :49-:52)



Hickman Video, dkt. 48-5.

Based on those facts, the district court concluded that a "reasonable jury could find that Lt. Lee lacked probable cause to believe that Mr. Manery posed an immediate threat to the safety of himself and others" during an encounter that lasted less than one minute and occurred just seconds after Manery refused commands not to start the Jeep and not attempt to flee. Dkt. 76 at 13-14.

Contrary to the district court's decision, no closely analogous case put Lt. Lee on notice that his decision to fire his weapon under these facts violated any of Manery's clearly established rights.

## SUMMARY OF THE ARGUMENT

Lt. Lee and his team were serving a warrant on an armed felon charged with serious crimes. Rather than following commands to surrender, Manery started the Jeep, rammed a police car as he tried to escape, and then hit a curb and stopped. (Had he not stopped when hitting the curb, he could have struck the other cars at the four-way stop behind him.)

Lt. Lee approached Manery, and Manery revved the Jeep and drove forward in Lt. Lee's direction. Lt. Lee quickly moved to the side of the approaching Jeep, evaluated the scene and facts known to him from Rutherford County, and fired within approximately a second or two after Manery ran into a second police car, which finally brought him to a halt.

Given the tense and rapidly evolving scene and the knowledge he possessed about Manery's past actions and threats, Lt. Lee acted within the bounds of the Fourth Amendment when he fired at Manery. Even if there were an issue of fact on that question, Lt. Lee is entitled to immunity because no reasonable police officer in Lt. Lee's tense and evolving circumstances would conclude that by firing at the armed, violent, and wanted suspect an officer would be violating clearly established law. Therefore, the district court's decision denying summary judgment should be reversed.

## ARGUMENT

**Lt. Lee is entitled to qualified immunity for his actions in apprehending a dangerous suspect wanted on a felony warrant for multiple charges.**

As a matter of law, Lt. Lee did not violate the Fourth Amendment in his use

of force. Lt. Lee acted within the limits of the Fourth Amendment even if there are disputes of fact about: (1) whether Manery was driving straight toward Lt. Lee when he fired; and (2) exactly where Lt. Lee was standing in relation to the Jeep when he first fired.

Qualified immunity analysis involves two-steps: "[A] state official is protected by qualified immunity unless the plaintiff shows: '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Lovett v. Herbert,* 907 F.3d 986, 991 (7th Cir. 2018) (quotation omitted), *reh'g and reh'g en banc.* Courts have discretion in deciding the order to address those steps. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Defendant will begin by addressing the first.

A.      *Lt. Lee did not violate the Fourth Amendment when he fired at Manery.*

1.      *General Fourth Amendment principles.*

The Fourth Amendment's "reasonableness" standard applies to Manery's claim of excessive force for the use of deadly force. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Sanzone v. Gray*, 884 F.3d 736, 739-40 (7th Cir. 2018). A claim for excessive force turns on the totality of the circumstances confronting law enforcement officers viewed from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018) (citing *Graham*, 490 U.S. at 396-97). This standard recognizes that officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (citing *Graham*, 490 U.S. at

396-97). Here, the district court correctly determined on summary judgment that Lt. Lee was facing that sort of rapidly evolving threat during the seconds Manery was trying to escape in the Jeep. Dkt. 76 at 14.

The Fourth Amendment's reasonableness test is "not capable of precise definition or mechanical application." *Graham*, 490 U.S. at 396 (citation omitted). Rather, its application requires the weighing of the totality of the facts and circumstances of each case, including (1) the "severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021). This calculus "'is a legal determination rather than a pure question of fact for the jury to decide.'" *Dockery*, 911 F.3d at 464 (citation omitted).

"When addressing the use of deadly force, a court considers whether a reasonable officer in the circumstances would have probable cause to believe that the suspect poses an immediate threat to the safety of the officers or others." *Sanzone*, 884 F.3d at 740 (citing *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015)). "If the suspect threatens the officer with a weapon, deadly force may be used." *Id*. "At that point, the risk of serious physical harm to the officer or others has been shown." *Id*. (citing *Scott v. Edinburg,* 346 F.3d 752, 756 n.2 (7th Cir. 2003)). Here, Manery threatened Lt. Lee and other persons with a vehicle that he used to ram two police cars, and he was reasonably believed to be armed and very dangerous given his threats of suicide by police.

2.     *Lt. Lee did not violate the Fourth Amendment by using deadly force given Manery's actions colliding with two police cars and driving toward Lt. Lee even though he was able to step out of Manery's path of travel during the crucial seconds before firing.*

The *Graham* factors weigh in favor of Lt. Lee and against the district court's determination that Lt. Lee's use of force raised an issue of fact for trial. First, Manery was wanted on a felony warrant for multiple crimes and was believed to be armed. Second, consistent with his outstanding warrant for assault with a weapon, Manery refused deputy commands, started the Jeep, struck two police cars, and then drove in Lt. Lee's direction after hitting a curb (which prevented him from striking the cars located at the intersection). For his actions, Manery pleaded guilty to a felony for resisting law enforcement.

The district court took Lt. Lee to task for arguing that he fired because Manery was "headed straight for him." Dkt. 76 at 15. The video evidence, however, shows that after Manery hit the curb and then revved his engine – a sound that Lt. Lee said was the loudest thing he ever heard – Manery did drive in Lt. Lee's direction. Plaintiff conceded as much when he admitted that after hitting the curb, he "drove forward, directly toward another police vehicle that was blocking his path forward. As William Manery drove forward toward a vehicle, Jason Lee fired . . . ." Dkt. 58 at 18.

While the district court found there existed a dispute whether Lt. Lee was directly in Manery's path at the moment Lt. Lee fired, it did not conclude that Manery was no longer driving in Lt. Lee's direction when he struck the second police car. For purposes of this appeal, Lt. Lee accepts the determinations by the

district court.

*But in concluding these disputed facts prevent summary judgment, the district court did not properly weigh in its reasonableness assessment that Lt. Lee had to make his split-second decision to fire with the knowledge that Manery had previously threatened to commit suicide by a confrontation with law enforcement, that Manery was wanted for multiple felony charges including a warrant for aggravated assault with a vehicle, and was armed—facts told to Lt. Lee and his team by another law enforcement agency.* Thus, at the moment Manery revved the Jeep's engine and drove forward from the curb, Lt. Lee had but a moment to move out of Manery's path and weigh all the facts known to him to decide whether to fire. As he did so, Lt. Lee knew he was in an especially dangerous situation where the armed Manery would be far more likely than other suspects to use deadly force to escape given his active warrants, his threats of suicide by police, and his already striking two police cars in a violent attempt to flee. Any reasonable officer would be within the bounds of the Fourth Amendment as a matter of law when making the choice that Lt. Lee made.

3. *The district court's decision improperly requires police officers to reevaluate instantly the need to use force in dangerous and evolving circumstances.*

The district court's summary judgment ruling was also incorrect because it improperly required Lt. Lee to reevaluate his decision in a split second as a dangerous situation evolved. The district court found that a jury should decide the reasonableness question because (1) the video shows Manery stopped after crashing into the second police car, and (2) Lt. Lee was able to move to the side of the Jeep

16

before firing. Thus, the district court incorrectly focused on the *exact moment* Manery hit the second vehicle, and expected Lt. Lee to re-evaluate the scene at that moment before taking action:

> Arguably, *at the moment of the collision*, the threat Mr. Manery posed *could have sufficiently diminished* such that the totality of the circumstances no longer warranted the use of any force, never mind deadly force.

Dkt. 76 at 17 (emphasis added).

The district court reinforced its view that the Fourth Amendment reasonableness inquiry required a reassessment of all the facts after Manery struck the second police car rather than giving Lt. Lee the benefit the legal doubt and allowing him to fire as Manery first drove towards him:

> Though it appears true that Mr. Manery had turned the Jeep's wheels in his (ultimately misguided) effort to drive away, *that was not the precise moment when Lt. Lee discharged his weapon*.

*Id*. at 17 (emphasis added).

The district court thus assumed that in the seconds after Manery hit the second police car and came to a stop when Lt. Lee had already decided to fire, Lt. Lee should have reassessed the situation to reconsider in his analysis the effect of Manery running into that second vehicle rather than quickly firing. Doing so, the district court reasoned, may have resulted in Lt. Lee's concluding that no force at all was needed. *Id*.

That reasoning fails to follow this Court's decision in *Brumitt* reversing the district court's denial of summary judgment. In *Brumitt*, a police officer (Sgt. Smith) found Brumitt lying down on a utility box in the parking lot of a bar around 3:00

a.m. Assuming Brumitt was drunk, Sgt. Smith asked if he was ok, and Brumitt said

no. There was some back and forth between them, and Smith reached for a debit

card in Brumitt's pocket to ID him. In response, Brumitt said, ""Don't you reach in

my butt, damn it. God damn it, don't reach in my butt."

> The dispute turned physical, and this Court explained what happened next:

> While seated, Brumitt swung his arm at Smith, and his open hand hit
> Smith's face in a roundhouse swing. Brumitt then slurred, "Get the
> fuck off me, motherfucker." Having never been hit while on duty, the
> attack startled but did not injure Smith. Smith grabbed Brumitt's shirt
> and punched Brumitt's face four times over (at most) four seconds,
> later saying, "You don't hit me." He described his response as "purely
> instinctual" and likely based on his training as a competitive fighter.
> (Smith holds several black belts.)

> Sometime during the four seconds, Brumitt lost consciousness. Smith
> did not realize or process that Brumitt was unconscious until after the
> fourth punch. Brumitt lay still for several minutes while Smith called
> an ambulance and handcuffed Brumitt…

*Brumitt* at *3. Brumitt sued Sgt. Smith for excessive force, and on summary

judgment, Sgt. Smith argued there was no Fourth Amendment violation and that

he was entitled to qualified immunity.

The district court denied summary judgment because while Brumitt

threatened Sgt. Smith, the force used was arguably undue because Sgt. Smith had

no reason to believe Brumitt was armed and because any threat posed by Brumitt

was lessened because he was drunk. *Id*. at *4 The district court also found that

Smith continued to use force after Brumitt was unconscious and that, between

punches, a reasonable officer would have seen "Brumitt with his arms at his sides

and his head tilted to the side" and therefore stopped punching. *Id*. at 4.

As to immunity, the district court said that the right asserted—to be free from the use of force once subdued—was clearly established. The court also supported its decision by adding that the parties disputed whether "Brumitt was unconscious and thus subdued after Sergeant Smith's second or third strike" and whether a "reasonable officer would have perceived him as unconscious and had time to recalibrate his use of force." *Id.* at *4.

This Court reversed the denial of qualified immunity in a unanimous decision. The Court explained that even assuming Sgt. Smith could have interrupted his punches to see that Brumitt had gone limp and unconscious, immunity could be denied only if "a reasonable officer in Smith's position *would know instantaneously that Brumitt was unconscious and react accordingly within less than four seconds. Brumitt has not, however, identified a case establishing that an officer must do so and must cease force at the precise second a suspect acquiesces. To the contrary, we give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations." Id.* at *5 (*internal citations omitted, emphasis added*).

While Brumitt was decided based on immunity, application of its principles shows that Lt. Lee did not violate the Fourth Amendment as a matter of law. In those tense few seconds after Manery reversed direction once he hit the curb, Lt. Lee had to move out of Manery's path, consider the risks posed to the other deputies after Manery hit a police car, and weigh the threat to the public and himself if Manery were allowed to continue his attempt to escape. Once he hit the second

police car and stopped, Lt. Lee had to think about whether an armed Manery would get the Jeep moving again or get out of the car and flee on foot. As Lt. Lee made his calculus, he also had to weigh the information about Manery's threat of suicide by police. Under these tense and rapidly evolving circumstances, Lt. Lee correctly determined he could fire. The district court's contrary conclusion was error.

On summary judgment, neither Manery nor the district court identified a case that required Lt. Lee to refrain from acting under the incredible stress he faced after Manery struck the second police car and stopped. Instead, the district court narrowly focused on the fact that Manery's forward movement ended before the "precise moment" Lt. Lee fired and suggested that after the second collision, there may have been no more threat.

The district court does not say *why* Lt. Lee may have reached such a conclusion, and we do not know what would have happened had he done so. Perhaps the district court thought that Manery may have been subdued either because he was incapacitated from the crash or because he would have chosen to surrender. Or perhaps Manery would have gotten out of the car and attacked Lt. Lee or one of the other deputies. But Lt. Lee did not know which of those things Manery would have done, just as there is no evidence supporting the district court's speculation that the threat may have ended.

This kind of review by the district court, using the benefit not only of hindsight, but also speculation, from the comfort of a judge's chambers, is exactly the sort of second-guessing the Supreme Court's qualified immunity decisions

forbid. As this Court explained in *Brumitt*, to accept the district court's reasoning, it would have had to "assume a reasonable officer in Sgt. Smith' position would know instantaneously that Brumitt was unconscious and react accordingly within less than four seconds." *Id.* at *5.

Like the lower court in *Brumitt*, the district court here assumed that Lt. Lee had instantaneous knowledge that Manery striking the second police car so reduced the threat that there may have been no need for force *at all* just a second or two later. That conclusion is simply not tenable. Moreover, Lt. Lee had far more information about Manery being dangerous than Sgt. Smith had about Brumitt. That is, from any objective measure, the threat to Lt. Lee and his team of deputies was far greater than the threat posed to Sgt. Smith. To impose on Lt. Lee an obligation to reassess in those two or three seconds after Manery struck a second police car rather than fire is simply more than the Constitution requires. Therefore, Lt. Lee acted within the Fourth Amendment's bounds when he shot Manery, and he is entitled to summary judgment.

B.      *At a minimum, Lt. Lee is entitled to qualified immunity for his actions.*

To overcome the assertion of qualified immunity, Manery must identify a closely analogous case demonstrating Lt. Lee's actions violated clearly established law. "While this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal citations and quotations omitted).

That task is especially difficult in Fourth Amendment cases, which require a balancing of interests through the *Graham* factors. In another case, this Court explained this principle in the context of *Pickering* balancing*:*

> It is important to underscore the significance that the latter part of the analysis announced in *Pickering* plays in qualified immunity cases. Differences in the nature of the competing interests from case to case make it difficult for a government official to determine, in the absence of case law that is very closely analogous, whether the balance that he strikes is an appropriate accommodation of the competing individual and governmental interests. We must remember that government officials are not expected to be prescient and are not liable for damages simply because they legitimately but mistakenly believed that the balancing of interests tipped in the State's favor.

*Gregorich v. Lund*, 54 F.3d 410, 414–15 (7th Cir. 1995); *see also*, *Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.")

Lt. Lee's life and the lives of his team members were at significant risk when serving the warrant. Manery's list of outstanding felony charges combined with his actions in striking two police cars after being told to surrender was, standing alone, sufficient to justify the use of deadly force.

But Lt. Lee knew more about Manery than that—information showing Manery was even more dangerous. He also knew that Manery was armed *and* had threatened to place himself in a situation where law enforcement officers would be forced to kill him. In light of those facts, any reasonable officer would be justified in firing at Manery given the situation Lt. Lee faced.

At this point, Plaintiff had to come forward in the district court with a closely

analogous case placing the Fourth Amendment question "beyond debate." Manery failed in that assignment. First, he heavily relied on an unpublished district court case, *Rincon v. United States,* 2012 WL 1981725 (N.D. Ind. June 1, 2012). But the district court correctly rejected that reliance out of hand as district court decisions cannot clearly establish a constitutional right. Dkt. 76, n.6 citing. *Day v. Wooten,* 947 F.3d 453, 462 (7th Cir. 2020).

Next, he relied on two cases from this Court, *Scott v. Edinburg,* 346 F.3d 752, 757 (7th Cir. 2003) and *Est. of Starks v. Enyart,* 5 F.3d 230, 234 (7th Cir. 1993). Neither case clearly established that Lt. Lee violated the Fourth Amendment contrary to the district court's opinion.

While both cases involve suspects who threatened officers with a vehicle, their similarities to Manery's confrontation with Lt. Lee end there. The district court summarized *Scott*:

> [A]n off-duty officer had stepped away from his Mustang after stopping at a gas station. In his absence, a man attempted to steal the Mustang. After being alerted to the car theft, the officer shouted commands at the suspect to stop. Rather than complying with the officer's commands, the man revved up the engine of the Mustang and drove the car in reverse toward the officer, prompting the officer to draw his revolver. When the Mustang stopped moving backwards and began moving forward in the direction of a dozen bystanders as well as the main roadway, the officer shot and killed the suspect. The parties in that case disputed the precise moment when the officer discharged his first shot; to wit, whether when the first shot occurred the suspect was still moving the car in reverse toward the officer. The timing of the first shot was "critical" to the determination of whether the suspect posed an immediate threat to the officer, for "the legality of the use of deadly force ended with the expiration of the threat." *Id.* at 757. However, the officer was found to be entitled to qualified immunity on the grounds that deadly force was reasonable to protect those dozen bystanders who stood in the immediate vicinity of the suspect's flight.

*Id.* at 759.

Dkt. 76 at 21-22.

Like the district court in our case, the court in *Scott* focused on a dispute over the precise moment the officer shot at the suspect. Because there was a dispute on whether the officer fired when the suspect was still backing up—the district court denied immunity on that issue.

But the basis for denying immunity in *Scott* over twenty years ago is in doubt given this Court's more recent decisions such as *Brumitt*. That case correctly recognized that law enforcement officers cannot instantaneously process changes in a chaotic situation and need not always pause to reassess the impact of those changes before defending themselves.

In part, *Brumitt* relied on the plaintiff's failure to find a case holding that an officer must cease a use of force at the "precise second a suspect acquiesces." *Brumitt* at *5. Applying that part of *Brumitt*, Lt. Lee did not need pause his decision to use force after Manery hit the second police car and came to a stop given all the other facts Lt. Lee knew about his dangerous suspect. As the Supreme Court teaches, officers must receive the benefit of the doubt in these sorts of life and death situations. *Donovan v. City of Milwaukee*, 17 F.3d 944, 951 (7th Cir. 1994).

The district court here did not give Lt. Lee this benefit of the doubt. Instead, it found that because he did not stop his use of force at the precise moment of Manery's second crash into a police car to reassess the scene and instead fired approximately a second or two later, it determined there is a question of fact for the

jury. Not only was that decision contrary to *Brumitt*, but it conflicted with earlier decisions from this Court and other Courts of Appeal.

First, *Brumitt* cited to *Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009). In *Johnson*, a suspect was fleeing police on foot and was cornered. *Id.* at 659. At that point, he put his hands up and made a "surprising, last-second surrender," just as the officer—in a split-second reaction—deployed his police dog on the suspect. *Id.* at 659–61. This Court concluded that the officer's reaction was reasonable given how closely the use of the taser followed the surrender. As *Johnson* says, "a reasonable officer must have sufficient time to comprehend that the suspect has been subdued." *Id.*

Contrasting *Johnson* on this point are two other cases this Court cited in *Brumitt*—*Strand v. Minchuk*, 910 F.3d 909 (7th Cir. 2018) and *Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016). In those cases, the officers were denied immunity because they had between 7 and 15 seconds (*Strand)* and 3 minutes (*Becke*r) to determine whether the suspects had been subdued and thus evaluate the need for force. *Brumitt* at *6.

The decisions in *Strand*, *Becker,* and *Johnson* are consistent with decisions from other circuits holding that law enforcement officers must be given sufficient time to interpret developing facts before they can be held liable for using force to stop a threat that developed before the officer is faced with those new facts. *See Bland v. City of Newark*, 900 F.3d 77, 85-86 (3rd Cir. 2018); *Mullins v. Cyranek,* 805

F.3dd 760, 766-67 (6th Cir. 2015); *Thomas v. Moody*, 653 Fed. Appx. 667, 673-74

(11th Cir. 2016).

The other case relied on below to deny immunity, *Estate of Starks v. Enyart*,

5 F.3d 230 (7th Cir. 1995), is also distinguishable. The district court said:

> In *Starks,* the Seventh Circuit ruled that a fleeing suspect's failure to
> brake after an officer suddenly stepped in front of his accelerating car
> did not pose a sufficiently grave threat to justify the use of deadly
> force. 5 F.3d at 234. There, the police used their own vehicles to corner
> a stolen taxicab in a parking lot. The driver placed the taxi in reverse
> and collided with a police vehicle, after which he attempted to pull
> forward, but a utility pole prevented his escape. The driver again
> attempted to maneuver the taxi and floor the accelerator, whereupon
> an officer jumped out from behind the utility pole and into the path of
> the moving taxi, prompting all three officers present at the scene to
> open fire. The holding in *Starks* turned on a single issue: whether the
> officer had "stepped in front of [the] rapidly moving cab, leaving [the
> driver] no time to brake." *Id*. at 233–34. Relying on the fact that the
> officer himself had increased the seriousness of the encounter by
> moving into the vehicle's trajectory without giving the driver time to
> stop, the court withheld the protections of immunity.

Dkt. 76 at 22.

*Starks* is different from our case in at least two material aspects. *First*, the

district court here found that unlike the officer in *Starks* who placed himself in front

accelerating car thus creating the need for the use of force, Lt. Lee moved to the side

of Manery's Jeep, and therefore did not by his own actions create the need for force.

*Second*, referring to the *Graham* factors, this Court said in *Sparks* that the officers

"knew that the underlying crime was not accomplished violently" and that Starks'

"escape attempt did not involve menacing a police officer or civilian with a

weapon—at least not until Black stepped into the path of a car that had just begun

to accelerate quickly." In contrast to Starks, whom officers had not encountered

before, Manery was known to Lt. Lee as armed, was wanted on a warrant for a series of felonies and was known as someone who said he wanted to die in a violent police encounter. Thus, the facts known by Lt. Lee move his actions to the permissible side of the qualified immunity equation.

This conclusion is buttressed by this Court's decision over thirty years ago in *Greenberg v. Kmetko,* 922 F.2d 382, 385 (7th Cir. 1991). As this Court explained then, government actors "need not predict [the law's] evolution, need not know that in the fight between broad and narrow readings of a precedent the broad reading will become ascendant." *Greenberg v. Kmetko* at 385. Instead, in instances where there is disagreement within the Circuit on how to analyze a Fourth Amendment issue, the "existence of such line-drawing problems calls for immunity; the rule should be established prospectively rather than at the expense of public employees who predict the development of the law incorrectly." *Sparks v. Stutler*, 71 F.3d 259, 261-62 (7th Cir. 1995).

Lt. Lee cannot predict how this Court will ultimately resolve the existing tension between cases such as *Scott* that require offers to pause and reevaluate immediately whenever it appears a suspect has been subdued—as the district court required here when Manery came to a stop—and cases like *Brumitt* that understand officers facing immediate risk of serious bodily injury cannot instantaneously change their intended course of action and must be given a leeway of least a few seconds. Similarly, balancing the *Graham* factor of seriousness of the offense means that *Starks* did not provide clear notice that Lt. Lee acted wrongly.

Until these issues are resolved, officers in highly dangerous situations like those confronted by Lt. Lee should receive immunity.

## CONCLUSION

Lt. Lee did not violate the Fourth Amendment when he shot a fleeing felon wanted for multiple charges and who, seconds before Lt. Lee fired, crashed a car into two police cars and who previously stated his intent to die in a violent confrontation with police. Even if this Court disagrees, Lt. Lee's split-second decision to fire in this rapidly evolving situation should be shielded by immunity.

FROST BROWN TODD LLP

By: _/s/ Anthony W. Overholt_

Anthony W. Overholt, #16481-49
Darren A. Craig, #25534-49
Alexander P. Will, #23474-49
FROST BROWN TODD LLP
111 Monument Circle, Suite 4500
P.O. Box 44961
Indianapolis, IN 46244-0961
Telephone:   (317) 237-3800
Facsimile:   (317) 237-3900
Email:        aoverholt@fbtlaw.com
              dcraig@fbtlaw.com
              awill@fbtlaw.com

Attorneys for Defendant-Appellant

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(A)(7)

The undersigned counsel, in compliance with F.R.A.P. Rule 32(a)(7), hereby certifies that this brief conforms to the rules contained in F.R.A.P. Rule 32(a)(7) for a brief produced with a proportionally spaced font. Specifically, based upon the word count of our word processing program, Microsoft Word 2016, I certify that the Brief of Defendant-Appellant contains 6,988 words, exclusive of the items listed in F.R.A.P. 32(f).

FROST BROWN TODD LLC

By: */s/Anthony W. Overholt*
Anthony W. Overholt, #16481-49

Dated: May 29, 2024

## CIRCUIT RULE 30(D) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by Circuit Rule 30(a) and (b) are included in the appendix.

*/s/Anthony W. Overholt*
Anthony W. Overholt

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2024, I electronically filed the foregoing Brief of Appellees with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Anthony W. Overholt*
Anthony W. Overholt

LR10348.0975408  4887-7670-0861v3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WILLIAM MANERY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-00239-SEB-MG |
| | ) | |
| JASON LEE, | ) | |
| MARION COUNTY SHERIFF'S OFFICE, | ) | |
| CONSOLIDATED CITY OF INDIANAPO- | ) | |
| LIS AND MARION COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiff William Manery ("Mr. Manery") filed this lawsuit against Defendants

Lieutenant Jason Lee ("Lt. Lee") in his official capacity, the Marion County Sheriff's Office

("MCSO"), and the Consolidated City of Indianapolis and Marion County ("Consolidated

City") (collectively, "Defendants"), pursuant to 42 U.S.C. § 1983 and Indiana statutes,

based on his claims regarding the use of deadly force against him during his arrest on an

out-of-state warrant. Defendants have moved for summary judgment. Dkt. 46. For the rea-

sons explained below, Defendants' motion is **DENIED IN PART** and **GRANTED IN

PART**.

**LEGAL STANDARD**

A motion for summary judgment asks the Court to find that a trial is unnecessary

because there is no genuine dispute as to any material fact and, instead, the movant is en-

titled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard

provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Material facts are those that "might affect the outcome of the suit," and a dispute about a material fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

When deciding whether a genuine dispute of material fact exists, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021).

## BACKGROUND

### I.   FACTUAL BACKGROUND

#### A.   Out of State Warrant

At approximately 3:36 p.m. on April 10, 2021, Lt. Lee, a reserve sheriff who regularly volunteered at the MCSO, was monitoring radio traffic through the computer aided dispatch ("CAD") when he overheard a request to execute an out-of-state arrest warrant from Rutherford County, Tennessee. The Rutherford County Sheriff's Office ("RCSO") had been actively tracking the suspect's cellular location information and had located him in a parking lot in downtown Broad Ripple, a neighborhood located in Indianapolis north of the downtown area. The RCSO's request included a description of the suspect's vehicle as being a white Jeep Cherokee with front-end damage and a Tennessee license plate. According to the CAD, the suspect was wanted for aggravated assault with a vehicle, evasion

of arrest, and violation of probation. CAD 2, dkt. 48-3. The CAD also warned that the suspect was possibly armed, potentially a flight risk, and on prior occasions had threatened "suicide by cop."[1] *Id.*

Because no photo of the wanted suspect accompanied the RCSO's request, MCSO Sergeant James Russo ("Sgt. Russo") radioed the control operator to request assistance in finding a photo of the suspect because Indiana officers cannot access out-of-state photo identifications. Lt. Lee, while still listening to the radio, searched the suspect's name on Facebook and located Mr. Manery's profile, which matched the description provided in the warrant. After Lt. Lee informed Sgt. Russo that he had found a photo of Mr. Manery, Lt. Lee was enlisted to assist in executing the warrant.

Lt. Lee met a team of deputies (the "warrant team"), which included Sgt. Russo and MCSO Deputy Sean White ("Deputy White"),[2] at the parking lot of an empty, out-of-business Kroger store in Broad Ripple. While congregated there, the warrant team formulated a plan based on their belief that Mr. Manery was located inside a nearby Broad Ripple apartment complex visiting a family member who resided there. The warrant team traveled to Mr. Manery's location where they spotted the white Jeep Cherokee in a parking lot adjacent to the apartment complex.

---

[1] We are informed that "suicide by cop" refers to an arrestee's placement of himself in a police encounter wherein law enforcement is required to resort to using deadly force.

[2] In total, the warrant team included Sgt. Russo, Lt. Lee, Deputy Sean White, Deputy Scott Craig, K-9 Cpl. Erik Stojkovich, K-9 Rhino, and Deputy Brandon Wilcox. Dkt. 48-2 at 146.

### B.    Warrant Execution

We derive the following facts from two clips of video footage provided by tenants of the adjacent apartment complex as well as from Lt. Lee's own testimony. Though Mr. Manery survived the encounter, his memory has been impaired by his use of methamphetamines at or around the time of this incident.

A caravan of deputies proceeded to the apartment complex parking lot, and, with Deputy White leading the way in his marked Dodge Charger, he observed the suspect's Jeep parked in a south-facing parking space. A blue sedan was parked on the left side of the Jeep. Deputy White pulled his vehicle behind the Jeep's driver's side, and Lt. Lee parked his marked Crown Vic on the Jeep's passenger side, parallel to Deputy White's Charger. Deputy Wilcox backed his squad car, an unmarked black sedan, into an empty parking space located approximately three spaces to the right of the Jeep.

Deputy White exited his vehicle and approached the driver's side of the Jeep where he discovered that the Jeep was occupied by man asleep in the driver's seat. Lt. Lee simultaneously approached the Jeep along the passenger side and identified the "disheveled" occupant as Mr. Manery. *See* Lee Dep. 49:3–4, dkt. 48-2.



Lambert Aff. ¶ 4, dkt. 48-5 (authenticating video evidence); *id.* Ex. 1 (video collected by Darren Hickman) (hereinafter "Hickman Video").

As shown in still shots captured from the video footage, Deputy White stood at the driver's side window and pointed his firearm and flashlight inside, awakening Mr. Manery with repeated commands: "Show me your hands!" and "Do not move!" Lee Dep. 35:19–21, dkt. 48-2; Manery Dep. 33:1–2, dkt. 48-1.[3] Lt. Lee stood outside the passenger side window, twice striking the window with the nose of his pistol to break the glass and deploy his taser. Meanwhile, Mr. Manery proceeded to shift his hands in and out of his pockets and eventually started the ignition, despite Deputy White's commands, "Don't do that! Do

---

[3] In the Internal Affairs Report, Deputy White stated that he did not retrieve his firearm until after Mr. Manery disobeyed commands to keep his hands where deputies could see them. Internal Affs. Rep. 4, dkt. 57-4. While we do not make credibility determinations at the summary judgment stage, Deputy White's rendition of the facts is flatly contradicted by video footage, which shows that Deputy White had drawn his weapon as he initially approached the Jeep and had pointed it at Mr. Manery when he started shouting commands. *See generally* Hickman Video, dkt. 48-5.

not start this car!" Internal Affs. Rep. 5, dkt. 57-8. This interaction continued for approxi-mately twenty seconds, during which time three more uniformed officers from the warrant team gathered around the Jeep.

      Mr. Manery put the Jeep in reverse, striking Deputy White's parked vehicle as he arced westward toward Westfield Boulevard, where at least two vehicles were idling their engines at a four-way stop sign. Four deputies rushed to their vehicles in anticipation of a possible vehicle chase, while Lt. Lee pursued the Jeep on foot. The Jeep struck a curb at the edge of the parking lot, which halted the Jeep's movement. As Lt. Lee pursued the Jeep on foot, he recalled that Mr. Manery had "revved his motor to the loudest fucking engine noise [he had] ever heard in [his] life." Lee Dep. 39:3–4, dkt. 48-2.



Hickman Video, dkt. 48-5. Still attempting to escape, Mr. Manery turned the Jeep's front wheels to the left and accelerated forward, promptly colliding into Deputy Wilcox's un-marked vehicle at a perpendicular angle.



*Id.* After Mr. Manery's car struck Deputy Wilcox's car, Lt. Lee opened fire. As depicted above, Lt. Lee is no longer visible in the video frame at the time he shoots his firearm at Mr. Manery. Though initially thinking he had only fired twice, it was determined that Lt. Lee discharged a total of nine bullets, all of which entered the Jeep through the driver's side door. Lee Dep. 43:21–25, dkt. 48-2. The first four to five shots were fired in quick succession, followed by a brief pause and then a volley of the remaining bullets. Four of these bullets struck Mr. Manery.

This encounter between the warrant team and Mr. Manery unfolded in less than sixty seconds.

After the shots were fired, Mr. Manery was removed from the Jeep and administered first aid until an ambulance arrived and transported him to the hospital in critical, but stable, condition. Mr. Manery was hit by bullets in his left arm, left hip, chest, and stomach.

Manery Dep. 23:19–20, dkt. 57-1. The parties dispute the nature and extent of Mr. Manery's injuries, but those issues are ultimately not germane to today's ruling.

Based on this failed effort to evade arrest, Mr. Manery has since pled guilty to one count of resisting law enforcement as a Level 6 Felony under Indiana law.

### C.    MCSO Use of Force Policies and Training

The MCSO has two policy sources addressing a proper use of force: General Order 21: Use of Force ("General Order 21") and the MCSO's Rules and Regulations ("Rules and Regulations").[4] Roberts Dep. 9:19–10:1, dkt. 48-6. These documents comprise the entirety of the MCSO's policies pertaining to the use of force, including excessive and deadly force. *Id.* 14:22–15:4. Relatedly, these policies apply equally to fulltime and reserve deputies. *Id.* 17:16–18.

Before commencing their service with the MCSO, all deputies, including both fulltime and reserve, are required to complete approximately 600 hours with the MCSO training academy, which academy is accredited by the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). Over the course of ten months, each candidate undergoes training on MCSO policies and procedures, including but not limited to the use of force.

---

[4] Defendants initially proffered five MCSO policies, three of which Mr. Manery contended were irrelevant to these facts. Specifically, Policy JP-2-32 applies only to the Jail Division; General Order 18.1 relates to remedial training and is optional at the supervisor's discretion; and General Order 18.3(a) outlines the policies and procedures for the Firearms Review Board, which becomes involved only after there has been a police-involved shooting. *See generally* Roberts Aff., dkt. 48-7. In their reply brief, Defendants apparently concede that the "MCSO may only have two policies governing the use of force," so we limit our discussion to the two undisputed policies. Defs.' Reply 11, dkt. 63.

CALEA performs annual reviews of the curriculum followed at the MCSO training academy to ensure compliance with CALEA standards. The State of Indiana also imposes certain statutory training requirements as well, for example, by requiring all reserve deputies to complete twenty-four hours of continuing education training each year.

Under MCSO department policy, reserve deputies must work a monthly minimum of thirty-two hours to retain their reserve status. *Id.* 31:7–15. There are, however, no department-imposed consequences for failure to meet the monthly work minimum. Lee Dep. 22:3–6, dkt. 57-3. From 2020 to 2021, the MCSO had opted not to enforce a monthly minimum at all. *Id.*

### D.   Lt. Lee's Training

In 2013, Lt. Lee completed his reserve academy training with the Morgan County Sheriff's Department. In 2016, before joining the MCSO, Lt. Lee completed 133 hours at the Indiana Law Enforcement Academy, receiving instruction on firearms and the use of force, among other subjects. According to MCSO records, Lt. Lee had received all the available and pertinent trainings on firearms, warrants, and use of force as of the time of his encounter with Mr. Manery.

### E.   MCSO Internal Investigation

The MCSO Internal Affairs investigated this incident with Mr. Manery as an officer-involved shooting. In addition to Lt. Lee, Internal Affairs interviewed the members of the warrant team and took recorded statements from Sgt. Russo, Deputy White, Deputy Wilcox, Cpl. Stojkovich, and Deputy Scott. Internal Affairs ultimately concluded that "Lt. Lee may be in violation of the following Marion County Sheriff's Office Rules and

Regulations" under Chapter IV: Firearms Policy, which defines the policy's purpose as "provid[ing] a reference to all the Departmental polices [sic] concerning the use, type, care, and handling of firearms . . . ." Internal Affs. Rep. 8, dkt. 57-4. Internal Affairs also found that Lt. Lee "may not be in violation" of General Order 21 and its prohibition against "[f]iring, at, or from, a moving vehicle unless the deputy's life, or another person's life, is in imminent danger of serious bodily injury or death and other options do not exist." *Id.*

Following an additional investigation by the Indianapolis Metropolitan Police Department ("IMPD"), Special Prosecutor Brian Eaton determined that no criminal charges would be filed against Lt. Lee.

## II.   PROCEDURAL HISTORY

Mr. Manery brought this civil action against Lt. Lee, the MCSO, and the Consolidated City in state court on January 17, 2022. Defendants timely removed it to federal court on February 1, 2022.

Mr. Manery's complaint asserts a Section 1983 claim against Lt. Lee for using unjustified deadly force in violation of the Fourth Amendment to the United States Constitution. He also brought a *Monell* claim against the MCSO and the Consolidated City for their alleged failures to train law enforcement officers. Lastly, Mr. Manery brought various state law claims against all Defendants for their purportedly negligent, criminal, malicious, and/or wanton actions.

Mr. Manery initially named Lt. Lee in both his individual and official capacities, but because the MCSO has since stated that Lt. Lee was acting in the scope and course of his employment during the incident at issue, Mr. Manery has dropped his claims against

Lt. Lee in his individual capacity. Pl.'s Resp. 13, dkt. 58. Similarly, Mr. Manery has conceded that his claims against the Consolidated City cannot proceed. *Id.* at 2.

On May 1, 2023, Defendants moved for summary judgment on all the remaining federal and state claims brought by Mr. Manery. That motion is now fully briefed and ripe for ruling.

## DISCUSSION

### I.   SECTION 1983 CLAIM AGAINST LT. LEE FOR VIOLATION OF THE FOURTH AMENDMENT

We begin by determining whether the facts, taken in the light most favorable to Mr. Manery, "depict a violation of a constitutional right." *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015). Mr. Manery alleges that Lt. Lee used excessive force in violation of the Fourth Amendment when he shot him. "A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment and accordingly must be reasonable." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002). Without a doubt, a nonfatal shooting, such as the one here, qualifies as an application of deadly force. *Smith v. Finkley*, 10 F.4th 725, 729, 738–42 (7th Cir. 2021). An officer acts reasonably when deploying force, if he has probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or to others. *Id.* at 736.

In evaluating the objective reasonableness—and, thus, the constitutionality—of an officer's use of force, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386,

396 (1989). However, "a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger[,] or he is actively resisting arrest and the circumstances warrant that degree of force." *Weinmann*, 787 F.3d at 448; *e.g.*, *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020). The fundamental concern in evaluating reasonableness is whether the totality of the circumstances justified a particular use of force to effect a seizure. *Smith*, 10 F.4th at 736.

"[W]hen an individual threatens a police officer with a deadly weapon, the officer is permitted to use deadly force in self-defense" because, at that point, "the risk of serious physical harm to the officer or others has been established." *Scott v. Edinburg*, 346 F.3d 752, 756 n.2, 757 (7th Cir. 2003). An automobile may be used as a deadly weapon; thus, officers may justifiably use deadly force when a suspect drives toward them with an automobile. *Id.* at 757. However, the occasion to use deadly force is temporally limited: Even "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993); *see*, *e.g.*, *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999) ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect.").

At bottom, the reasonableness inquiry is an objective one, meaning that courts must "assess the totality of the circumstances 'from the perspective of a reasonable officer on the scene' " without regard to facts later revealed through the "benefit of hindsight, discovery, and careful analysis." *Siler*, 957 F.3d at 759 (quoting *Graham*, 490 U.S. at 396). In so doing, we consider "the information known to the officer at the time of the encounter; the

12

duration of the encounter; the level of duress involved; and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances." *Id.* (quoting *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018)). In short, "[t]he law does not divorce the objective constitutional standard from . . . reality." *Logan v. City of South Bend*, 564 F.Supp.3d 719, 728 (N.D. Ind. 2021).

Summary judgment "is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, (7th Cir. 2010); *e.g.*, *Siler*, 957 F.3d at 759. When presented with a genuine dispute of material fact at summary judgment, courts are tasked to view those facts in the light most favorable to the nonmovant. *Smith*, 10 F.4th at 730. Courts need not "indulge stories clearly contradicted by the footage" because, in those instances, there can be no genuine factual dispute. *Id.* (quoting *Horton*, 883 F.3d at 944). However, "videos are sometimes unclear, incomplete, and fairly open to varying interpretations." *Id.* (quoting *Horton*, 833 F.3d at 944). Where some videos may conclusively establish what happened, others may leave factual questions unanswered. *Id.* Those "ambiguous" videos "can be relied on only for those facts that can be established 'with confidence' and 'beyond reasonable question.' " *Id.* (quoting *Johnson v. Rogers*, 944 F.3d 966, 967, 969 (7th Cir. 2019)).

Applying these legal principles, the key inquiry before us is whether a reasonable jury could find that Lt. Lee lacked probable cause to believe that Mr. Manery posed an immediate threat to the safety of himself and of others. In making this determination, due regard is owed to the uncertainties that Lt. Lee and the other deputies confronted that day.

13

Lt. Lee knew that Mr. Manery was wanted on a warrant for aggravated assault with a vehicle, evading arrest, and violating probation. Lt. Lee also reasonably believed that Mr. Manery was armed with a handgun and had (on unspecified prior occasions) threatened suicide by cop.[5] It is also undisputed that Mr. Manery demonstrated active resistance to the MCSO deputies by disregarding their repeated commands and attempting to flee.

Though nearly two hours elapsed between the dispatcher's transmission of the Rutherford County's warrant request and the warrant team's execution of that warrant, the actual encounter with Mr. Manery occurred in less than a minute. During that brief span of time, the scene evolved into an unpredictable, highly stressful situation, requiring Lt. Lee to make split-second judgments.

However, "the totality of the circumstances to justify a seizure includes the period just before and during the shooting." *Smith*, 10 F.4th at 739. As a matter of Fourth Amendment jurisprudence, an officer may justifiably use deadly force when a fleeing felon drives at him with a vehicle. *Est. of Starks v. Enyart*, 5 F.3d 230, 233–34 (7th Cir. 1993).

Therein lies the factual dispute in the record before us. Lt. Lee contends that, when he made the decision to open fire, Mr. Manery was driving straight toward him, therefore justifying the use of deadly force. Defendants also claim that "Plaintiff cannot dispute many of these facts because . . . he has virtually no memory of his encounter with the MCSO's

---

[5] Although Mr. Manery ultimately turned out to be unarmed, he does not dispute that Lt. Lee permissibly relied on the information conveyed by the dispatcher. "Knowledge of facts and circumstances gained after the fact has no place in the post-hoc analysis of the reasonableness of the actor's judgment." *Siler*, 957 F.3d at 760 n.10 (quoting *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988)) (cleaned up). Thus, that the dispatcher conveyed inaccurate information has no bearing on the reasonableness of Lt. Lee's reliance.

warrant team." Defs.' Reply 2, dkt. 63. This assertion is "simply false." *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021). "Taking the facts in the light most favorable to the non-moving party does not mean that the facts must come only from the nonmoving party. Sometimes the facts taken in the light most favorable to the nonmoving party come from . . . other sources." *Id.* Such is the case here, where Mr. Manery has identified factual disputes contained within the video footage, arguing that Lt. Lee was "safely out of the way" before shooting and that he was blocked from driving forward by the other on-scene police vehicles. Our review of the evidence before us leads us to conclude that Mr. Manery has satisfied his burden at this summary judgment stage in establishing the existence of genuine disputes of material fact.

According to Lt. Lee's description of these events, after the Jeep struck the curb, he heard a loud engine noise followed by the Jeep's forward movement. Lt Lee says that he fired his weapon as Mr. Manery drove the Jeep toward him. Lee Aff. ¶ 23; *see also* Lee. Dep. 39:7, dkt. 48-2 (testifying that he "was in front of the Jeep" as it "started proceeding in [his] direction"). Lt. Lee's testimony describes the Jeep's trajectory before it hit the parked car, but he did not testify that the Jeep was still heading straight toward him after the collision that stopped the Jeep's forward movement. In fact, nowhere in Lt. Lee's deposition testimony or affidavit does he personally mention the Jeep's collision with the parked car or its effect on his calculus. *Cf.* Lee. Dep. 44:12–15, dkt. 48-2 ("Like, how your client's vehicle is ran [sic] into that, to that police car? I don't remember that."). When questioned about whether the parked vehicle blocked Mr. Manery's ability to drive forward, Lt. Lee's responses offered little clarity:

Q: Does it look, from these images, that that car is blocking Mr. Manery's ability to drive forward?

A: No.

Q: How come?

A: Well, that car was parked in the parking—in a parking stall. Mr. Manery struck that vehicle.

Q: But it wasn't blocking him?

A: I mean, yeah, there's several vehicles parked there. If he hits all those vehicles, those vehicles are blocking him.

*Id.* at 40:10–20.

The video footage makes clear that Lt. Lee fired his first shot after Mr. Manery had collided with the parked car and was no longer moving forward. On this basis alone, a reasonable juror could discount Lt. Lee's version of the facts and conclude instead that Mr. Manery's escape had effectively been prevented by the preceding collision. If a jury were so to conclude, it would undermine Lt. Lee's argument that Mr. Manery posed an immediate threat that justified deadly force.

Moreover, Lt. Lee's statement that he had been standing in front of the Jeep when he decided to fire does not comport with subsequent testimony by him that he had moved forty-five degrees off to the side. *Id.* at 40:23–41:1. During certain critical moments, Lt. Lee disappears from the videoframe, which combined with his testimony leaves unanswered the issue of his proximity to the Jeep at the moment he fired. *See id.* at 48:4–5 ("Q: Where do you think you were standing? A: How far does brass travel?").

16

In the summary judgment briefing, Lt. Lee argues that the Jeep's front wheels were turned toward him, thus placing him "directly in the Jeep's path when he decided to shoot." Defs.' Reply 8, dkt. 63. Though it appears true that Mr. Manery had turned the Jeep's wheels in his (ultimately misguided) effort to drive away, that was not the precise moment when Lt. Lee discharged his weapon. From the video footage, it seems clear that Lt. Lee did not shoot Mr. Manery until *after* the Jeep had hit the parked car. Lt. Lee's description of the Jeep's wheels, therefore, simply does not take into account the obvious obstruction of the parked car.

Lt. Lee's subjective belief that Mr. Manery was driving straight at him does not convert his belief into an objective one. We cannot conclude, as Lt. Lee asks us to, that an objective officer standing in his shoes would believe that Mr. Manery was destined to run him over with the Jeep—especially not after the Jeep was immobilized (even if only momentarily) by its collision with the other parked car. Arguably, at the moment of the collision, the threat Mr. Manery posed could have sufficiently diminished such that the totality of the circumstances no longer warranted the use of any force, never mind deadly force. *Smith*, 10 F.4th at 748. Once the threat had subsided, a reasonable officer may not fairly view those circumstances to warrant deadly force. *Id.*; *accord Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.").

Lt. Lee also argues that his decision to use deadly force was justified to protect other deputies and those in the immediate vicinity. This argument, too, is premised on Lt. Lee's belief that Mr. Manery was driving "straight towards" him. Whether Mr. Manery was

actually still headed toward Lt. Lee after the collision with the parked car is a question the jury must resolve at trial.

At the summary judgment stage, we need only determine whether a reasonable juror could view the evidence as Plaintiff does, and here, the answer is yes. *Rios v. City of Chicago*, 523 F.Supp.3d 1020, 1026 (N.D. Ind. 2021). In weighing all the evidence—including the video footage, witness testimony, and circumstantial evidence—we hold that a reasonable juror could find that Mr. Manery was not driving directly toward Lt. Lee, nor could he after colliding with the parked car, so as to warrant a use of deadly force by the officer to protect himself or others in the area.

It is undisputed that at least two vehicles sat at the four-way stop sign adjacent to the parking lot. But whether Mr. Manery posed an immediate threat to them once he struck the curb and changed course is not at all clear. A factual dispute remains as to whether Mr. Manery posed an immediate threat once he was no longer moving forward at all. *Cf. Tousis v. Billiot*, 84 F.4th 692 (7th Cir. 2023) (officer fired weapon "as soon as" vehicle pulled forward). In addition, the collision that halted Mr. Manery's forward motion raises questions about whether Mr. Manery posed an immediate risk to the public's safety and, consequently, whether deadly force was reasonable on that basis. Because we cannot resolve these factual questions on summary judgment, the motion must be denied.

## II.   QUALIFIED IMMUNITY

Notwithstanding the reasonableness inquiry, Lt. Lee maintains that he is entitled to qualified immunity. When governmental actors perform discretionary functions, qualified immunity shields them from liability for civil damages "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity grants "no license to lawless conduct"; rather, it focuses on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Id.* at 818–19. In effect, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To determine whether qualified immunity protects an officer's use of deadly force, trial courts are directed to address two issues: (1) whether, taking the facts in the light most favorable to the plaintiff, the officer's conduct violated a constitutional right; and (2) whether the particular constitutional right was "clearly established" at the time of the alleged violation. *In re Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010) (citations omitted).

Qualified immunity "leaves ample room for mistaken judgments by police officers." *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003) (internal quotation omitted). Police, therefore, receive immunity from suits that arise out of their reasonable mistakes of fact or law. Accordingly, qualified immunity could protect Lt. Lee's conduct from civil liability if an objectively reasonable officer would think, as Lt. Lee says he did, that the Jeep was headed directly at him. In other words, if the Jeep's collision with the parked car reduced the threat of Mr. Manery's driving directly toward Lt. Lee, would an objectively reasonable officer still find the use of lethal force appropriate? Given the factual disputes in the record before us, we must acknowledge that a reasonable officer could find that the threat posed

19

by Mr. Manery to the officers' safety had lessened to a point where, given the totality of the circumstances, deadly force was no longer warranted. *See Smith*, 10 F.4th at 748.

Where a factual dispute precludes resolution of the first inquiry, as it does here, an officer may still be entitled to qualified immunity if the right was not clearly established. Accordingly, we assume but without deciding the constitutional violation and move on to the second step in the qualified immunity analysis. *Pearson v. Callahan*, 555 U.S. 223, 236–43 (2009).

For purposes of qualified immunity, "[a] right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018) (internal quotation omitted). There are two circumstances where a right will be regarded as clearly established. First, qualified immunity offers no refuge "if [the Seventh Circuit] or the Supreme Court ha[s] previously held that conduct analogous to the defendant officer's actions constitutes a violation of the right at issue." *Id.* A closely analogous case is not required in the second scenario, where a defendant officer's conduct is so "egregious" that no reasonable officer could believe he had acted lawfully. *Id.* (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000)).

Courts undertake this inquiry "in [the] light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Though there need not be a case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). Because courts focus "on whether the officer had fair notice that [his] conduct was unlawful,

reasonableness is judged against the backdrop of the law at the time of the conduct."
*Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

Mr. Manery relies on two Seventh Circuit cases for the proposition that he had a
clearly established right to be free from the use of excessive force.[6] *Scott v. Edinburg*, 346
F.3d 752, 757 (7th Cir. 2003); *Est. of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993).
Though this phrasing frames the right at stake too broadly, it is clear (and Defendants agree)
that deadly force is justified when a fleeing suspect drives straight at an officer. Thus, we
next ask whether every reasonable officer facing the same circumstances described here
would understand that his use of deadly force was unlawful. *See D.C. v. Wesby*, 583 U.S.
48, 63 (2018).

In *Scott*, an off-duty officer had stepped away from his Mustang after stopping at a
gas station. In his absence, a man attempted to steal the Mustang. After being alerted to the
car theft, the officer shouted commands at the suspect to stop. Rather than complying with
the officer's commands, the man revved up the engine of the Mustang and drove the car in
reverse toward the officer, prompting the officer to draw his revolver. When the Mustang
stopped moving backwards and began moving forward in the direction of a dozen bystand-
ers as well as the main roadway, the officer shot and killed the suspect. The parties in that
case disputed the precise moment when the officer discharged his first shot; to wit, whether

---

[6] Mr. Manery also cites *Rincon v. United States*, an unpublished district court case, as support for
his clearly established right. 2012 WL 1981725 (N.D. Ind. June 1, 2012). However instructive
*Rincon* might be, it certainly "cannot clearly establish a constitutional right because [it is] not
binding precedential authority." *Day v. Wooten*, 947 F.3d 453, 462 (7th Cir. 2020).

when the first shot occurred the suspect was still moving the car in reverse toward the officer. The timing of the first shot was "critical" to the determination of whether the suspect posed an immediate threat to the officer, for "the legality of the use of deadly force ended with the expiration of the threat." *Id.* at 757. However, the officer was found to be entitled to qualified immunity on the grounds that deadly force was reasonable to protect those dozen bystanders who stood in the immediate vicinity of the suspect's flight. *Id.* at 759.

In *Starks*, the Seventh Circuit ruled that a fleeing suspect's failure to brake after an officer suddenly stepped in front of his accelerating car did not pose a sufficiently grave threat to justify the use of deadly force. 5 F.3d at 234. There, the police used their own vehicles to corner a stolen taxicab in a parking lot. The driver placed the taxi in reverse and collided with a police vehicle, after which he attempted to pull forward, but a utility pole prevented his escape. The driver again attempted to maneuver the taxi and floor the accelerator, whereupon an officer jumped out from behind the utility pole and into the path of the moving taxi, prompting all three officers present at the scene to open fire. The holding in *Starks* turned on a single issue: whether the officer had "stepped in front of [the] rapidly moving cab, leaving [the driver] no time to brake." *Id.* at 233–34. Relying on the fact that the officer himself had increased the seriousness of the encounter by moving into the vehicle's trajectory without giving the driver time to stop, the court withheld the protections of immunity.

Both *Scott* and *Starks* involved a suspect driving directly at an officer, which action posed an immediate threat that might justify the use of deadly force. Lt. Lee maintains that

his use of deadly force was justified because he had fired his weapon as the Jeep moved ahead to strike him. The underlying factual disputes previously identified here foreclose that conclusion. Viewing the facts in the light most favorable to the non-moving party (Mr. Manery), the Jeep's movement toward Lt. Lee stopped when the Jeep struck the parked car. Lt. Lee's decision to shoot was made after Mr. Manery had nowhere to go, which effectively reduced the immediacy of the threat to the officers, making the use of deadly force unjustified.

Clearly, this "qualified immunity determination is intertwined with factual disputes concerning threat level." *Smith*, 833 F.3d at 749. A ruling on qualified immunity, therefore, must await a resolution of material factual disputes by the jury. *Id.* at 750. Only then may we properly reach a legal determination on the issue of qualified immunity. *Id.* (citing *Est. of Escobedo v. Martin*, 702 F.3d 388, 403–04 (7th Cir. 2012)). The motion for summary judgment based on qualified immunity is thus denied.

## III. *MONELL* CLAIM

Though municipalities cannot be held vicariously liable for constitutional violations, they may find themselves liable "when execution of a government's policy or custom inflicts [an] injury," thus forming the basis of a Section 1983 lawsuit. *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 694 (1978).

To establish governmental liability, the plaintiff must show: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that, albeit not codified in either law or municipal policy, is so permanent and well settled so as to constitute a "custom or usage" with the force of law; or (3) an allegation that the

constitutional injury was caused by an individual with "final policymaking authority." *Est. of Crouch v. Madison Cnty.*, 682 F. Supp. 2d 862, 877 (S.D. Ind. 2010) (quoting *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007)).

A municipality will be liable for constitutional violations when its failure to train its officers adequately amounts to deliberate indifference to the rights of those individuals with whom officers come into contact. *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Of course, "there can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights." *Id.*

Here, it is undisputed that General Order 21 and the MCSO Rules and Regulations provided the standards for determining the appropriate circumstances for the use of force. Consistent with state standards, all fulltime and reserve sheriffs with the MCSO must complete 600 hours at an accredited training academy, as well as continued education courses every year. Nevertheless, Mr. Manery argues that the MCSO's policies and procedures and the accompanying training were insufficient, thus constituting deliberate indifference to the rights of the public. Because Mr. Manery has failed to adduce sufficient evidence that demonstrates the MCSO's deliberate indifference, his *Monell* claim necessarily fails.

Mr. Manery first takes issue with the fact that the MCSO has enacted only two use of force policies, but what ultimately matters for *Monell* purposes, as Defendants note, is that these policies were in place, were extensive, and covered all aspects of the use of force and that Lt. Lee was trained on them. Beyond vaguely suggesting that these two policies might in some way be inadequate, Mr. Manery articulates no challenge specific to their substance, nor does he dispute that Lt. Lee had been trained on these policies.

24

Mr. Manery also argues that Lt. Lee's inability during his deposition to recite with specificity the contours of his training or the MCSO's use of force policy demonstrates that the MCSO was deliberately indifferent in administering officer training. That Lt. Lee provided incomplete or otherwise unsatisfactory responses in his deposition, however, does not, nor could it, automatically make the MCSO liable for a failure to train. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 390–91 (1989); *see also Lapre v. City of Chicago*, 911 F.3d 424, 437 (7th Cir. 2018) (officers' failure to recall specific training programs does not amount to deliberate indifference). Mr. Manery points to no evidence from which we can reasonably infer deliberate indifference by the MCSO as a matter of policy or widespread practice. *Lapre*, 911 F.3d at 437.

Mr. Manery also contends that Defendants themselves failed to proffer "evidentiary materials in support of their defense," and, thus, they have not shown the absence of a genuine issue of material fact sufficient to merit summary judgment in their favor. Pl.'s Resp. 26, dkt. 58. More specifically, Mr. Manery claims that Defendants failed to produce evidentiary materials that fell within a request for production during discovery. For this omission, Mr. Manery argues, Defendants cannot prevail on a claim that the MCSO engages in a widespread practice of failing to train its deputies.

Mr. Manery's argument is misplaced in several respects. First, he improperly seeks to transform his burden of demonstrating a viable *Monell* claim into Defendants' burden of disproving his *Monell* claim. There is no legal authority that supports such a shift. Second, and perhaps more importantly, a summary judgment responsive brief is not the appropriate setting in which to raise a discovery dispute for the first time. Mr. Manery's contention

arises from Plaintiff's First Request for Production of Documents, wherein he sought "[a]ll documents that evidence, support, contradict, refer to, and/or relate to any claim that the actions each Defendant took were not in violations of William Manery's constitutional rights and/or were not negligent." Pl.'s Resp. 27, dkt. 58. Defendants produced General Order 21 while also objecting to the request as being overly broad. MCSO RFP Resp. 15, dkt. 64-1.

General Order 21 directs the MCSO to conduct an annual analysis of all uses of lethal and less lethal weapons to identify trends or patterns that could instruct future improvements in the MCSO trainings and policies. Roberts Aff. Ex. 2, 22, dkt. 48-7. However, Mr. Manery apparently never specifically requested copies of those annual reports, nor did he follow up in response to Defendants' discovery objection, as provided by our Local Rule 37-1, whereby the parties must meet and confer in good faith to resolve discovery disputes before seeking court intervention. *See generally* S.D. Ind. Local Rule 37-1. Even if the parties had met and conferred but without reaching a resolution, a responsive brief to a motion for summary judgment is not the point at which to raise the issue with the court; indeed, Plaintiff's delay represents a failure to exercise due diligence. *See Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1057 n.5 (7th Cir. 2000) ("[W]e believe that a party needing additional discovery is under an obligation to bring the issue before the court in an expeditious manner.").

Having failed to adduce evidence from which a reasonable juror could find that the MCSO was deliberately indifferent in its training of Lt. Lee or any of its other officers with

regard to the use of deadly force, Mr. Manery's *Monell* claim against the MCSO fails, and Defendants are entitled to summary judgment on this claim.

## IV.   STATE LAW CLAIMS

Mr. Manery has also brought various state law claims against Defendants Lt. Lee in his official capacity as well as against the MCSO. Mr. Manery has already conceded that the Consolidated City is not responsible for the actions of the MCSO or its employees and, therefore, is not a properly suable entity. Mr. Manery's remaining claims allege that the MCSO was negligent in training and supervising Lt. Lee; and that Lt. Lee's and the MCSO's actions were negligent, criminal, malicious, and/or willful and wanton in their conduct.

### A.   Indiana Tort Claim Act Immunity

Mr. Manery has sued Lt. Lee in both his personal and official capacities. Under the Indiana Tort Claims Act ("ITCA"), Ind. Code § 34-13-3-3, there is no liability on the part of an individual employee who was acting within the scope of his employment. *Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014). Here, it is undisputed that Lt. Lee, a reserve deputy with the MCSO, was acting within the scope of his duties during his confrontation with Mr. Manery. Accordingly, Mr. Manery's state law claims against Lt. Lee in his personal capacity necessarily fail.

The ITCA also grants immunity against civil liability based on an officer's purported negligence in the execution of law enforcement duties. *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind. Ct. App. 2002); *F.D. v. Indiana Dep't of Child Servs.*, 1 N.E.3d 131, 136 (Ind. 2013) ("The negligence of a defendant is not relevant if it is immune.

Immunity assumes negligence but denies liability.") (internal quotation marks and citation omitted). Here, it is undisputed that Lt. Lee was engaged in law enforcement duties at the time of his encounter with Mr. Manery: therefore, Lt. Lee is entitled to the ITCA immunity on Mr. Manery's negligence claims against him.

### B.    Use-of-force Statute

Indiana law provides complete immunity for police officer civil liability based on the "justified use of force," as it is defined in Indiana Code § 35-41-3-2. *See generally* I.C. § 34-30-31-1. Section 35-41-3-2 states that the use of deadly force is justified "if the person reasonably believes that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony." *Id.* § 35-41-3-2.[7] Indiana's excessive force standard parallels the Fourth Amendment standard, permitting officers to utilize reasonable force in effectuating an arrest. *Est. of Williams v. Indiana State Police*, 26 F.Supp.3d 824, 863 (S.D. Ind. 2014). In this regard, Mr. Manery's excessive force claim under state law rises or falls with his Section 1983 claim. *Id.* at 864. Thus, the previously detailed factual disputes that foreclose our resolution of the issues relating to Lt. Lee's use of deadly force under Section 1983 also preclude resolution of Mr. Manery's state law claims at this stage of the proceedings.

---

[7] Mr. Manery argues that section 35-41-3-3(c) is "more applicable" here because it codifies the circumstances when a law enforcement officer is justified in using deadly force to effect an arrest. The Indiana Code's civil immunity statute, however, specifically directs us to section 35-41-3-2, so we shall follow that instruction. In any event, Mr. Manery has not explained how reliance on either statute would affect the outcome of our analysis. Thus, we shall adhere to the statutory language as written.

Defendants maintain that they are entitled to judgment because Mr. Manery pled guilty to a forcible felony, and Indiana law permits the use of deadly force to deter a person engaged in committing a forcible felony. Relying on *Cromer v. Sefton*, 471 N.E.2d 700, 705 (Ind. Ct. App. 1984), Mr. Manery argues that his guilty plea is inadmissible to establish any of the elements in his civil case. *See also Matter of Knight*, 55 F.3d 231, 236 (7th Cir. 1995) (discussing imposition of civil liability based on party's guilty plea). In *Cromer*, the Indiana Court of Appeals, in apparent agreement with Mr. Manery, explained that "[e]ven a guilty plea is not conclusive but is only evidence as an admission." 471 N.E.2d at 705.

It is undisputed that Mr. Manery entered a guilty plea to one count of resisting law enforcement, a Level 6 Felony under Indiana law. The plea agreement, in relevant part, expressly stipulates that it "constitutes an admission of the truth of all the facts alleged in the charge or counts" to which Mr. Manery has pled guilty. Plea Agreement 2, dkt. 57-11. Nowhere in the plea agreement, however, is a recitation of the underlying facts giving rise to the charge. According to Mr. Manery, he pled guilty because "[s]upposedly I hit two cop cars and tried to run from them." Manery Dep. 35:23–24, dkt. 48-1. Defendants' contention that Mr. Manery pled to "driving . . . at Lt. Lee" is not supported in the factual record before us. Defs.' Br. 20, dkt. 47. The factual dispute on this point remains unresolved.

Without reference to the factual basis for Mr. Manery's plea agreement, that document does not, in and of itself, operate as an admission against his interest. Well-established precedent holds that "[a]n arrestee's commission of a crime does not justify the use of force without limit." *Perri v. Daggy*, 776 F.Supp. 1345, 1347 (N.D. Ind. 1991). Defendants have

29

thus failed to establish their entitlement to judgment as a matter of law on these state law claims. Summary judgment is accordingly denied.

## CONCLUSION

For the reasons explicated above, Defendants' Motion for Summary Judgment, dkt. 46, is **DENIED IN PART** and **GRANTED IN PART**. The motion is <u>denied</u> as to Plaintiff's Section 1983 and corresponding state law claims against Lt. Lee and the MCSO. The motion is <u>granted</u> as to Plaintiff's *Monell* claim against the MCSO and state law negligence claim against Lt. Lee. The case shall proceed accordingly.

The Clerk is **DIRECTED** to terminate Defendant Consolidated City of Indianapolis and Marion County from the docket.

IT IS SO ORDERED.


Date:

     2/9/2024

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Frederick Holton Hovde
Waldron Tate Bowen Spandau
holt@wtb-lawyers.com

Amy Stewart Johnson
Frost Brown Todd LLP
asjohnson@fbtlaw.com

John P. Lowrey
City of Indianapolis
john.lowrey@indy.gov

Barry F. McGinley
Frost Brown Todd LLP
bmcginley@fbtlaw.com

Joshua S. Moudy
KAMMEN & MOUDY
josh@kammenlaw.com

Anthony W. Overholt
Frost Brown Todd LLP
aoverholt@fbtlaw.com

Katherine Anne Piscione
Waldron Tate Bowen Land LLC
katie@wtb-lawyers.com

Brandon Eric Tate
Waldron Tate Bowen LLC
brandon@wtb-lawyers.com